## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 5:22-cr-536 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Carmen E. Henderson |
| DANTE T.H. BERRY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Case No. 5:23-cr-222 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jennifer Dowdell Armstrong |
| DAIXHAN TOLBERT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Case No. 4:23-cr-503 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Thomas M. Parker |
| | ) | |
| STEVE GARDNER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

In separate cases, Defendants Dante T.H. Berry, Daixhan Tolbert, and Steve Gardner move to dismiss the indictments charging them with being felons in possession of a firearm and ammunition in violation of federal law.  They argue that

this prohibition violates their Second Amendment rights.  For reasons that follow, the Court **DENIES** Defendants' motions.

**FACTUAL AND PROCEDURAL BACKGROUND**

Because these cases involve the same constitutional question, the Court considers that legal question together in the interest of judicial economy.  It does so against the following legal standard and factual background in each separate case.

A.     *United States v. Berry* **(No. 5:22-cr-536)**

Defendant Dante Berry was born in Ohio 23 years ago.  (*Berry* ECF No. 12, PageID #36.)  At age 18, he pled guilty to three criminal charges in State court: receiving stolen property, petty theft, and telecommunications fraud.  (*Id.*, PageID #39.)  The State trial court sentenced him to intervention in lieu of conviction under Section 2951.041 of the Ohio Revised Code.  (*Id.*)  Roughly one year later—in April 2020—he was arrested and eventually pled guilty to robbery, a third-degree felony. (*Id.*, PageID #41.)  The State trial court terminated Mr. Berry from the intervention in lieu of conviction program and imposed concurrent sentences for robbery and the prior offenses, two of which were also felonies.  (*Id.*, PageID #39–40 & #41.)  Mr. Berry received a 30-month sentence but within nine months gained admission to a reentry court program.  (*Id.*, PageID #41.)  Mr. Berry violated the conditions of that program. (*Id.*, PageID #41–42.)

On his twenty-second birthday, Mr. Berry was arrested for having a weapon under disability, in violation of Section 2923.13, the Ohio equivalent of the federal felon-in-possession statute.  (*Id.*, PageID #42.)  Citing "jail overflow," Defendant's probation officer explained that Mr. Berry "was placed in a halfway house" following

2

his arrest.  (*Id.*, PageID #38.)  But Mr. Berry absconded from the house and failed to appear in State court for his August 2022 arraignment.  (*Id.*, PageID #38 & #42.)

Soon after, on September 15, 2022, the United States indicted Mr. Berry for the same incident of firearm possession—a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) based on his prior felony conviction.  (*Berry* ECF No. 1.)  As charged in the indictment, on July 24, 2022, Mr. Berry possessed a Smith & Wesson pistol and ammunition, which had both crossed State lines.  (*Id.*, PageID #1.)  According to the indictment, Defendant's predicate offense was his 2020 conviction for felonious robbery.  (*Id.*, PageID #1.)  According to the initial report from Pretrial Services, this conviction resulted from a guilty plea to an amended indictment, the offense of conviction was a felony of the third degree—punishable under Ohio law with 9 to 36 months in prison, Ohio Rev. Code § 2929.14(A)(3)(b)—and, as noted, Mr. Berry was sentenced to 30 months in prison, of which he served less than 10 months plus additional time in a community-based correctional facility.  (*Berry* ECF No. 12, PageID #41–42.)  At the time of that offense, Mr. Berry was 19 years old.  (*Id.*, PageID #41.)

Under Ohio law, a robbery offense requires a theft (or attempted theft) plus one of three aggravating acts.  Ohio Rev. Code § 2911.02(A).  The first two aggravating acts—having a deadly weapon or inflicting (or attempting or threatening) physical harm—plus theft are second-degree felonies.  *Id.* § 2911.02(B). The third, use of (or threatened immediate use of) force against another is a third-degree felony.  *Id.*   Against this background, Mr. Berry's conviction for third-degree

felony robbery indicates that he either attempted or committed theft and used or threatened to use force against another to do so. *Id*. § 2911.02(A)(3).  Under the law of this Circuit, "a defendant need not engage in violent force in order to" commit third-degree robbery as defined under Ohio law, at least for purposes of determining whether the offense is a crime of violence under the United States Sentencing Guidelines. *See United States v. Yates*, 866 F.3d 723, 728 (6th Cir. 2017).

In February 2023, Ohio dismissed its charge for having a weapon under disability (*Berry* ECF No. 12, PageID #42), leaving this federal indictment as the sole felon-in-possession charge Mr. Berry faces.  No information regarding the underlying offense conduct appears in the record.  In terms of his criminal history, in less than five years Mr. Berry amassed four criminal convictions, including three felonies, and two other felony charges for possessing a firearm with a felony conviction.

### B.    *United States v. Tolbert* (No. 5:23-cr-222)

Defendant Daixhan Tolbert was born in New York in 1999. (*Tolbert* ECF No. 5, PageID #11.)  In 2018, he was convicted of robbery in State court in Ohio.  (*Tolbert* ECF No. 1, PageID #1.)  The record does not contain information about that offense, but the Court takes judicial notice of the information publicly available on the docket of the Summit County Court of Common Pleas in Case No. CR-2018-06-2102.  According to that court's dispositive journal entry, entered on October 26, 2018, Mr. Tolbert pled guilty to robbery under Section 2911.02(A)(3) of the Ohio Revised Code, a felony of the third degree.  As part of the plea, the State trial court dismissed a firearm specification, and on January 23, 2019, the State trial court sentenced

4

Mr. Tolbert to 3 years of community control, which it terminated in 2023 after sentencing him to time served for a community control violation.

At age 20, in 2019 Mr. Tolbert was charged with burglary, a second-degree felony, and ultimately pled guilty to trespass in a habitation, a felony of the fourth degree, in State court in Ohio. (*Tolbert* ECF No. 5, PageID #14.)  He received a two-year community control sentence, but the record shows violations and failures to appear. (*Id.*)  In 2020, Mr. Tolbert received a 180-day sentence for domestic violence, a first-degree misdemeanor, with 8 days credited for time served and 172 days suspended.  (*Id.*)  In 2021, Mr. Tolbert was convicted of two first-degree misdemeanors for assault in two separate incidents, for which the State municipal court sentenced Defendant to short terms in jail and ordered him to take anger management courses.  (*Id.*, PageID #15.)

In February 2023, the State of Ohio charged Mr. Tolbert with having a weapon under disability (as a felon), menacing, threatening domestic violence, receiving stolen property, and being a fugitive from justice.  (*Id.*, PageID #15.)   The Summit County docket also shows an additional charge of obstructing official business.  The offense conduct for the charges also gave rise to his prosecution in federal court in this case.  On April 20, 2023, a grand jury indicted Mr. Tolbert for possessing a firearm and ammunition as a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).  (*Tolbert* ECF No. 1.)  According to the indictment, Defendant's predicate offense was his conviction in 2018 for felonious robbery.  (*Id.*, PageID #1.)  Soon after the United States charged Mr. Tolbert with possessing a firearm as a felon, the State

5

dismissed its case (*Tolbert* ECF 5, PageID #15.), leaving this federal indictment as the sole felon-in-possession charge that Mr. Tolbert faces.

Pretrial Services recommended that Mr. Tolbert be released on bond.  (*Id.*, PageID #16.)   Following a hearing, however, the Magistrate Judge ordered Mr. Tolbert detained.  (*Tolbert* Minutes, Aug. 17, 2023; *Tolbert* ECF No. 12.)  On Defendant's motion, and over the objection of the United States, the Court ordered Mr. Tolbert released subject to certain conditions to ensure public safety.  (*Tolbert* Minutes, Oct. 31, 2023; *Tolbert* ECF No. 28.)  In connection with Defendant's motion to revoke pretrial detention, the record contains additional background information on the charges Mr. Tolbert now faces.  The United States filed a police report showing that an officer responded to a domestic dispute on February 4, 2023.  (*Tolbert* ECF No. 23-7, PageID #159.)  According to the report, Mr. Tolbert "threatened to shoot the caller" and then he fled from responding officers.  (*Id.*)  The victim told the officer that she believed Mr. Tolbert "was going to shoot her," but later she declined to press charges.  (*Id.*)  During an ensuing search of Mr. Tolbert's mother's home, in the bedroom that multiple family members identified as Mr. Tolbert's, officers found a pistol—a Black Kimbler 1911—that was reported stolen in West Virginia.  (*Id.*) Discovery of that weapon is the factual basis for the felon-in-possession charge in this case.

### C.     *United States v. Gardner* (No. 4:23-cr-503)

Defendant Steve Gardner is 40 years old and was born and continues to live in Youngstown, Ohio.  (*Gardner* ECF No. 6, PageID #19.)  At age 18, Mr. Gardner pled guilty to felonies in two separate cases for receiving stolen property.  (*Id.*, PageID

#22–23.)  The initial report from Pretrial Services describes one of the offenses as "[o]peration without a valid license." (*Id.*, PageID #22.)  The State trial court sentenced Mr. Gardner to six months in prison for these offenses, to run concurrently, with probation to follow.  (*Id.*, PageID #22–23.)  Two years later, Mr. Gardner was charged with and convicted of obstructing justice, a felony of the fifth degree, for which he was sentenced to 18 months of community control.  (*Id.*, PageID #24.)  One month later, Mr. Gardner violated the terms of his community control and was terminated from probation less than six months after sentencing.  (*Id.*)

The next year, at age 20, the State of Ohio charged Mr. Gardner with first-degree murder.  (*Id.*)  That charge included a gun specification.  (*Id.*)  After two years of pretrial case management, during which time he was confined to jail, Mr. Gardner pled guilty to voluntary manslaughter, a first-degree felony, without a firearm specification.  (*Id.*)  He was sentenced to three years in prison, with 770 days credit for time served.  (*Id.*)  Within one year of serving that sentence, Mr. Gardner was convicted of two counts of felony trafficking in cocaine and sentenced to an additional year of imprisonment.  (*Id.*, PageID #25.)  The day before his sentence for the trafficking offense, he pled no contest and was found guilty of first-degree misdemeanor assault and sentenced to 180 days in jail, 177 days of which were suspended and three of which were credited for time served.  (*Id.*)

In 2010, at age 27, Mr. Gardner was charged with two counts of aggravated robbery, one count of improper discharge of a firearm at a habitat, and one count of having a weapon under disability.  (*Id.*, PageID #26.)  He was convicted of aggravated

7

robbery, a first-degree felony, with a firearm specification and having weapons under disability, a third-degree felony, for which he received a prison sentence of seven years. (*Id.*) Mr. Gardner sustained an additional felony conviction in 2018 for possessing cocaine and a fourth-degree misdemeanor conviction for criminal trespass, for which he received a 12-month suspended prison sentence and was placed on three years of community control. (*Id.*, PageID #27.) About a week before the charges in this case, Mr. Gardner was convicted of illegal use or possession of drug paraphernalia, a fourth-degree misdemeanor. (*Id.*, PageID #28.) For this offense, Mr. Gardner spent 8 days in jail and received a year of probation. (*Id.*)

On August 9, 2023, the United States filed a criminal complaint against Mr. Gardner for possessing a firearm as a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (*Gardner* ECF No. 1, PageID #1.) According to the affidavit supporting the criminal complaint, on September 10, 2022, near midnight, a State patrol sergeant pulled over a vehicle driving northbound on I-680 in Mahoning County. (*Gardner* ECF No. 1-1, ¶ 9, PageID #4–5.) The car was reported stolen. (*Id.*) Mr. Gardner was the driver and allegedly refused to comply with the officer's demands. (*Id.*, PageID #5.) He lay down on the road and refused to move. (*Id.*) The officer handcuffed Mr. Gardner and conducted a pat down search. (*Id.*) He found a Smith & Wesson SD9 pistol in Defendant's waistband, loaded with 16 rounds of ammunition. (*Id.*) The gun was manufactured outside of Ohio. (*Id.*, ¶ 10, PageID #5.)

According to both the affidavit and indictment, Defendant has two predicate felony convictions in State court that prevent him from possessing a firearm: (1) the 2010 aggravated robbery conviction; and (2) the 2006 voluntary manslaughter conviction. (*Id.*, ¶ 8, PageID #4; *Gardner* ECF No. 10, PageID #35.) Under Ohio law, first-degree voluntary manslaughter results from causing death "while under the influence of sudden passion or in a sudden fit of rage." Ohio Rev. Code § 2903.03(A). And Ohio law defines aggravated robbery as "attempting or committing a theft offense" with one of three aggravating circumstances: (1) possessing "a deadly weapon . . . and [to] either display the weapon, brandish it, indicate that the offender possesses it, or use it"; (2) having on oneself or having control over "a dangerous ordnance"; or (3) inflicting or attempting to inflict "serious physical harm on another." *Id.* § 2911.01(A). Against this background, Mr. Gardner's convictions for first-degree felony voluntary manslaughter and aggravated robbery indicate that his felonious conduct resulted in the loss of life, *id.* § 2803.03(A), and that he used a deadly weapon, maintained control of a deadly ordinance, or otherwise inflicted or attempted to inflict serious physical harm in the course of committing a theft, *id.* § 29011.01(A).

Following his arrest in this case, a grand jury returned an indictment on September 7, 2023 for the same offense initially charged in the criminal complaint, but the indictment charges iolation of 18 U.S.C. § 924(a)(8) instead of Section (a)(2). (*Gardner* ECF No. 10, PageID #35.) Defendant faces pending charges in State court related to the same conduct that gives rise to this federal prosecution—possessing a concealed weapon in a vehicle as a felon. (*Gardner* ECF No. 6, PageID #27.) The

totality of Mr. Gardner's criminal history shows that he has spent most of his adult life charged with, incarcerated for, or under supervision for criminal acts, most of which have been felonies and many of which include the use or attempted use of violence.

*     *     *

In each of their individual cases, Defendants filed motions to dismiss the indictment, arguing that "Section 922(g)(1)'s total lifetime ban on . . . possessing a firearm . . . runs afoul of the Second Amendment." (*Berry* ECF No. 22, PageID #78; *Tolbert* ECF No. 17, PageID #74–75; *Gardner* ECF No. 14, PageID #64.)  Drawing on Sixth Circuit precedent and the nation's history of gun regulation, the United States opposes the motions.  (*Berry* ECF No. 25, PageID #89–90 & #95–112; *Tolbert* ECF No. 19, PageID #84–86 & #90–108; *Gardner* ECF No. 15, PageID #70–72 & #77–94.)

On January 16, 2024, the Court heard oral argument on the motions and took the matter under advisement.  Before and after oral argument, the parties filed various notices of supplemental authority to bring other recent relevant decisions to the attention of the Court.

## GOVERNING LEGAL STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  Under the Fifth and Sixth Amendments, an indictment must "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend."  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  A defendant may move to dismiss a defective indictment for "failure to state an offense."  Fed. R. Crim. P.

12(b)(3)(B)(v).  On a motion to dismiss, the Court must read the indictment "as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications." *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007).  A defendant may move to dismiss an indictment for failure to state an offense on the basis that the "statute apparently creating the offense is unconstitutional." *United States v. Rathburn*, 771 F. App'x 614, 623 n.8 (6th Cir. 2019) (quoting *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973)).

## A.    Nature of the Challenge

At oral argument, counsel for Defendants clarified that they bring both facial and as-applied challenges to the constitutionality of 18 U.S.C. § 922(g)(1).  A law is facially unconstitutional if "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U. S. 739, 745 (1987).  In contrast, an as-applied challenge tests only whether the contested "law is unconstitutional as enforced against the [party] before the court" based on the discrete facts in the case. *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013).

"Facial challenges are disfavored . . . ." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).  "The usual judicial practice is to address an as-applied challenge before a facial challenge . . . ." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 327 (6th Cir. 2009) (en banc) (citation omitted).  In keeping with the usual practice, the Court first takes up Defendants' as-applied challenges.  As a result, it need not address the facial constitutionality of Section 922(g)(1).  *See Coleman v. Dewitt*, 282 F.3d 908, 914 n.3 (6th Cir. 2002) ("If

the statute is constitutional as applied to the defendant's activities, it *a fortiori* fails the *Salerno* standard.").

### B.     Second Amendment Standard

Defendants argue that the indictments charging them with knowingly possessing a firearm and ammunition as felons violates the Second Amendment, which provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II.

### B.1.   Supreme Court Precedent

The constitutionality of felon dispossession does not arise on a clean slate.  In a trilogy of cases, the Supreme Court defined the Second Amendment right, incorporated it against the States, and announced the standard for judicial review of regulations that burden this fundamental right.  Although a fourth case is pending at the Supreme Court—*United States v. Rahimi*, No. 22-915, *cert. granted* 143 S. Ct. 2688 (2023)—the parties agreed that the Court should decide Defendants' motions without waiting for a decision in *Rahimi*, which specifically involves a different statute, 18 U.S.C. § 922(g)(8)—not 18 U.S.C. § 922(g)(1).

### B.1.a. Individual Right

In *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the Supreme Court confirmed that "the Second Amendment conferred an individual right to keep and bear arms."  At the Second Amendment's core, the Supreme Court explained, lies "the inherent right of self-defense" that long predated the United States Constitution. *Id*. at 592, 628.  *Heller* involved two District of Columbia gun regulations:  one, a "total[]

ban" on "handgun possession in the home"; the other, a requirement "that firearms in the home be rendered and kept inoperable at all times." *Id.* at 628, 630.  Because the plaintiff has a constitutional right to possess a gun in his home, neither restriction withstood judicial review.  *Id.* at 635.

To reach this conclusion, the Supreme Court worked methodically through the text and history of the Second Amendment.  Starting with the text, the Supreme Court recognized the "unique" structure of the Amendment, a "prefatory clause" preceding the "operative clause."  *Id.* at 577.  While the preface—"A well regulated Militia, being necessary to the security of a free State"—may serve a "clarifying function," the Supreme Court explained, it "does not limit or expand the scope of the" substantive right conferred in the operative provision.  *Id.* at 578.  Parsing the terms of the operative clause, the Supreme Court reasoned that the phrase "the right of the people" recognized an individual right bestowed on "all Americans."  *Id.* at 581.  The Supreme Court determined that to "keep arms" meant to "possess[]" them and to "bear arms" included "carrying of weapons" in a personal capacity "outside of an organized militia."  *Id.* at 583, 584.  The Supreme Court said the Second Amendment's purpose announced in the prefatory clause—"to prevent elimination of the militia"— "fits perfectly" with an individual-rights understanding of the operative guarantee. *Id.* at 598, 599.  After all, the term "militia" in colonial America consisted of able-bodied men between certain ages.  *Id.* at 580.

In so holding, the Court rejected the view of four dissenters who, in light of the Second Amendment's prefatory clause, read the Second Amendment as referring only

to a "collective right" in "the several States to maintain a well-regulated militia." *Id.* at 610; *id.* at 637 (Stevens, J., dissenting).  In the dissent's view, "the right to keep and bear arms" extends to "certain military purposes" but "does not curtail the Legislature's power to regulate the nonmilitary use and ownership of weapons." *Id.* at 637 (Stevens, J., dissenting).

To confirm its textual analysis, the Supreme Court's majority looked to history. The Second Amendment "has always been widely understood" to have "codified a *pre-existing* right," the contours of which historical practice defines.  *Id.* at 592. *Heller* looked to the pre-Revolutionary experience of the English—who enshrined "the right to have arms in the English Bill of Rights" of 1688 after the Crown disarmed opponents "to suppress political dissidents." *Id.* at 592–93, 598.  A century, American colonists resented King George III for disarming them.  *Id.* at 594.  The Supreme Court's historical survey included arms-bearing guarantees in State constitutions of the Founding Era; post-ratification commentary from luminaries like St. George Tucker, William Rawle, and Joseph Story; legislation from before and after the Civil War; and post-War commentary from Thomas Cooley and others.  *Id.* at 600–02, 606–09, 610, 614 & 616–19.  From each era and source, the Supreme Court drew support for the notion that "the Second Amendment protected an individual right to use arms for self-defense." *Id.* at 616; *see also New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19–22 (summarizing "*Heller*'s methodological approach").

After articulating the Second Amendment's original meaning, *Heller* found three extant precedents aligned with the historical individual-rights understanding of the Amendment.

*First*, the Supreme Court addressed the Second Amendment for the first time in *United States v. Cruikshank*, 92 U.S. 542, 553 (1875), which vacated the convictions of the racist perpetrators of the Colfax Massacre of 1873. *Cf. McDonald v. City of Chicago*, 561 U.S. 742, 757 (2010) (reciting the facts of *Cruikshank*). In *Cruikshank*, the United States prosecuted the defendants for depriving the massacred victims of their "constitutional rights, including the right to bear arms." *Id*. *Cruikshank* stated that the Second Amendment "restrict[s] the powers of the national government" without affecting State and local authority to infringe on arms possession. 92 U.S. at 553, *abrogated by McDonald*, 561 U.S. at 758. According to the Supreme Court in *Cruikshank*, because the Second Amendment did not curtail States' police power, it "le[ft] the people" through the democratic process "to look for their protection against any violation" of the right to bear arms. *Id*. In *Heller*, the Supreme Court treated this passage in *Cruikshank* as support for "the individual-rights interpretation" because it did not relate to militia service. *Heller*, 554 U.S. at 620.

*Second*, in *Heller*, the Supreme Court read the discussion of the Second Amendment in *Presser v. Illinois*, 116 U.S. 252 (1886), to say "nothing about [its] meaning or scope." *Id.* at 621. *Presser* held that an Illinois law prohibiting "bodies of men to associate together as military organizations, or to drill or parade with arms

15

in cities and towns unless authorized by law, do[es] not infringe the right of the people to keep and bear arms." 116 U.S. at 264–65. In *Presser*, the Supreme Court relied on its precedent in *Cruikshank*, which provided "a conclusive answer." *Id.* at 265.

*Third*, as discussed below, in *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court upheld regulations in the National Firearms Act of 1934 against a Second Amendment challenge. There, the defendant unlawfully transported an unregistered, sawed-off shotgun across State lines. *Id.* Because "the Second Amendment [does not] guarantee[] the right to keep and bear such an instrument," the Supreme Court rejected his Second Amendment defense. *Id.* By confining the Second Amendment "to certain types of weapons" (those related to militia service), the *Heller* Court read *Miller* to "positively suggest[]" that the Second Amendment confers an individual right. *Heller*, 554 U.S. at 622; *see also id.* at 610–11 (citations omitted).

### B.1.b. Incorporation Against the States

Two years after *Heller*, the Supreme Court addressed gun regulation in *McDonald v. City of Chicago* and held that "the Second Amendment right is fully applicable to the States" through the Fourteenth Amendment. 561 U.S. at 750. The City of Chicago had in-home gun restrictions similar to those *Heller* invalidated. Chicago conditioned gun possession on valid registration, even in the home, and "then prohibit[ed] registration of most handguns," "effectively banning handgun possession by almost all private citizens who reside in the City." *Id.* The Second Amendment had not previously been an impediment to State action. *See Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. 243, 247 (1833); *Cruikshank*, 92 U.S. at 553. But in

16

*McDonald*, 561 U.S. at 791, the Supreme Court reasoned that the Fourteenth Amendment "incorporates the Second Amendment right," such that it applies against the States, so the Chicago restrictions met the same fate as the District of Columbia's restriction challenged in *Heller*.

Incorporating the Second Amendment required the Court to conclude that "the right to keep and bear arms is fundamental to our scheme of ordered liberty." *Id.* at 767 (emphasis omitted). In *McDonald*, as in *Heller*, the "basic right" to self-defense loomed large. *Id.* The *McDonald* Court catalogued history once again, from pre-Revolutionary England to colonial America, from the Founding, through Reconstruction. *Id.* at 768–77. Channeling *Heller*, the Court determined that "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778.

Aspects of the lead opinion in *McDonald* garnered only a plurality. *See id.* at 805–06 (Thomas, J., concurring). Moreover, separate opinions by Justices Scalia, Thomas, Stevens, and Breyer engaged in a robust debate about whether, and if so how, the Second Amendment applies to State action. For present purposes, *McDonald*'s controlling opinion established the right to bear arms as a fundamental constitutional guarantee that constrains State regulations. *Id.* at 791.

### B.1.c. Methodology

In the ten plus years that passed between *McDonald* and *Bruen*, jurists voiced concern that the lower courts were "relegating the Second Amendment to a second-class right." *Friedman v. Highland Park*, 577 U.S. 1039, 1043 (2015) (Thomas, J.,

dissenting from denial of certiorari, joined by Scalia, J.); *see also Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 706 (6th Cir. 2016) (en banc) (Batchelder, J., concurring in judgment in part); *see also Rogers v. Grewal*, 140 S. Ct. 1865, 1875 (2020) (Thomas, J., dissenting from denial of certiorari, joined by Kavanaugh, J.). After *Heller*, courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Bruen*, 597 U.S. at 17 (2022); *see, e.g.*, *Tyler*, 837 F.3d at 685.

In *Bruen*, however, the Supreme Court rejected that approach as involving "one step too many." *Id*. at 19.  It did so because the federal courts gave insufficient weight to the core constitutional right to keep and bear arms at the heart of the Second Amendment when weighed against the government's interest in the regulation of firearms. *Id*. at 18 & 22–24.  Put another way, the federal courts found that few restrictions on the fundamental right to possess firearms violated the Constitution.  As a result, the Supreme Court changed the focus of the analysis to direct the inferior courts to take the right at issue seriously.

In *Bruen*, the Supreme Court took up a challenge to New York's "may[-]issue" licensing regime.  597 U.S. at 14.  Unlike 43 States, which "must issue concealed-carry licenses" to qualified applicants, New York and five other States gave public officials "discretion to deny concealed-carry licenses even" to applicants who met the statutory licensing criteria. *Id*. at 13, 14.  Under that regime, an applicant in New York had to convince a State official he had "proper cause" to carry a concealed weapon outside the home. *Id*. at 15.  In short, for an applicant to exercise Second

Amendment rights, New York required "demonstrating to government officers some special need." *Id*. at 70. Because New York did not "identify an American tradition justifying the State's proper-cause requirement," the Court held the law unconstitutional. *Id*.

In addition to that substantive ruling, *Bruen* identified a particular methodology to govern future Second Amendment challenges. *Bruen* repudiated the means-end-scrutiny that most appellate courts, including the Sixth Circuit, used for Second Amendment challenges after *Heller* and, "[i]n keeping with *Heller*," adopted instead a framework focused on the Nation's history and tradition of firearm ownership and regulation. *Id*. at 17.

To do so, the Supreme Court "summarize[d]] *Heller*'s methodological approach to the Second Amendment," then applied "the constitutional standard endorsed in *Heller* . . . to New York's proper-cause requirement." *Id*. at 19, 31. Under this approach, the Supreme Court had "little difficulty concluding that" the Second Amendment's text covers "carrying handguns publicly for self-defense." *Id*. at 32. Then, the Supreme Court poured through the Anglo-American history of firearm regulation, spanning English antiquity to the 20th Century. *Id*. at 33–70. After that "long journey," the Supreme Court found no historical practice "justifying the State's proper-cause requirement." *Id*. at 70.

### B.1.d. Supreme Court Dicta

Formally, *Heller*, *McDonald*, and *Bruen* do not determine the constitutionality of the federal felon-in-possession statute or any particular prosecution under it. Those cases analyzed and held unconstitutional restrictions on gun possession in

one's home and public-carry licensing. Their holdings do not address felon dispossession. *See Bruen*, 597 U.S. at 76 (Alito, J., concurring); *id*. at 81 (Kavanaugh, J., concurring). But *dicta* in each decision addresses felon dispossession. And Supreme Court *dictum*, though not formally binding, must receive at least "substantial weight." *United States v. Fields*, 53 F.4th 1027, 1048 n.13 (6th Cir. 2022) (collecting cases).

In *Heller*, the Supreme Court took pains not to "cast doubt on longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. It labelled those regulations "presumptively lawful." *Id*. at 627 n.26. Further, the Supreme Court tailored its discussion of the Second Amendment to "the right of law-abiding, responsible citizens." *Id*. at 635; *see also id*. at 625 ("law-abiding citizens"). *Heller* made such statements to demonstrate that "the right secured by the Second Amendment is not unlimited." *Id*. at 626. "*Heller* approved, in dicta, laws that prohibit dangerous persons, including felons and the mentally ill, from having arms." *Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting) (citing *Heller*, 554 U.S. at 626). And *McDonald* "repeat[ed] those assurances." 561 U.S. at 786 (plurality).

*Bruen* reinforced the point. From the opinion's opening sentence to its final paragraph, *Bruen* addressed the Second Amendment "right of an ordinary, law-abiding citizen." 597 U.S. at 9; *see also id*. at 26, 29, 38, 60, 70 & 71. Notably, when distinguishing New York's discretionary may-issue regulation from the "'shall-issue' licensing regimes" of 43 other States, the Supreme Court explained that the latter

20

"are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  *Id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635). Albeit in *dicta*, the Supreme Court has repeatedly signaled that a felon—who, by definition, is not law abiding—may be disarmed.  In its briefing and at oral argument, the United States emphasizes these aspects of *Heller*, *McDonald*, and *Bruen*.

In all three cases, however, these statements are best understood as the Court confining its analysis to the individual parties in the case before it—all of whom were law abiding citizens.  Indeed, the *Heller* Court "assum[ed] that Heller [wa]s not disqualified from the exercise of Second Amendment rights," 554 U.S. at 635, and *Bruen* recognized that the private parties involved were "law-abiding, adult citizens," 597 U.S. at 15.  If the *dictum* on which the United States relies disposes of the question or supplants the historical analysis that *Bruen* compels, then it is up to the Supreme Court to say so.  Thus far, the Supreme Court has *not* held that the Second Amendment only secures the right to keep and bear arms of those Americans who have always been law-abiding.  Further, these cases did not purport "to clarify the entire field" of permissible gun regulation.  *Heller*, 554 U.S. at 635.  *Heller*, *McDonald*, and *Bruen* left unanswered whether the laws reviewed in those cases could constitutionally be applied to dangerous, irresponsible, or law-breaking people.  *See* Transcript of Oral Argument at 48, *United States v. Rahimi*, No. 22-915 (U.S. argued Nov. 7, 2023).  But *Bruen*'s methodology dictates *how* to evaluate open questions such as these.

### B.2.    Sixth Circuit Precedent

The United States maintains that the Sixth Circuit decided cases under *Heller*'s first step that remain binding precedent after *Bruen*.    A Sixth Circuit "decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision" or the Sixth Circuit itself overrules it *en banc.  Salmi v. Secretary of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).    Ultimately, none of the cases on which the United States relies controls here.

### B.2.a. Pre-*Bruen* Caselaw

In *Stimmel v. Sessions*, 879 F.3d 198, 201 (6th Cir. 2018), the Sixth Circuit addressed whether 18 U.S.C. § 922(g)(9), which disarms domestic violence misdemeanants, violates the Second Amendment.    The court upheld the law by applying the two-step framework that *Bruen* later repudiated.    *Compare id.* at 204 (describing the two steps), *with Bruen*, 597 U.S. at 19 (rejecting the second).    Indeed, in *Stimmel*, the United States did "not demonstrate[] that the Second Amendment, as historically understood, excludes" domestic abusers at step one, and so at step two the law survived "intermediate scrutiny" on the strength of the government's enforcement interest.    879 F.3d at 205, 207, 211.    And while *Stimmel* observed that the court "ha[s] upheld § 922(g)(1), which disarms even non-violent felons," this was *dictum.  Id.* at 211.    More importantly, *Stimmel*'s methodology was inconsistent with *Bruen*'s.

In *United States v. Whisnant*, 391 F. App'x 426, 430 (6th Cir. 2010), the Sixth Circuit affirmed the constitutionality of Section 922(g)(1) on the authority of circuit

precedent. *Whisnant*'s conclusion relied on two prior cases (without historical inquiry): *United States v. Khami*, 362 F. App'x 501, 507–08 (6th Cir. 2010); and *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) (citing *United States v. Frazier*, 314 F. App'x 801, 807 (6th Cir. 2008) (plain-error review)). The United States cites each decision. All four—*Whisnant*, , *Khami*, *Carey*, and *Frazier*—follow the same line of reasoning. Each treats as dispositive *Heller*'s observation that "prohibitions on the possession of firearms by felons" are presumptively valid. *Heller*, 554 U.S. at 626. Just one case acknowledged that the statement was *dictum*, but the court nevertheless relied on it to reject a *facial* challenge to Section 922(g)(1). *Khami*, 362 F. App'x. at 508 (citing *Salerno*, 481 U.S. at 745). None of the four cases is controlling authority because none establishes a historical tradition of felon dispossession as *Bruen* requires. Nor is the unpublished decision in *United States v. Swaggerty*, No. 16-6677, 2017 WL 11622737, at *1 (6th Cir. Oct. 18, 2017), which relied on these decisions and the same approach of means-end scrutiny that does not survive *Bruen*.

### B.2.b. Basis of Prior Circuit Precedent

The source of the Sixth Circuit's two-step, intermediate-scrutiny approach is *United States v. Greeno*, 679 F.3d 510, 517–18 (6th Cir. 2012). *See Bruen*, 597 U.S. at 18, 19 n.4 (citing *Greeno*). *Greeno*—authored by a judge of the Ninth Circuit sitting by designation—did not involve a felon-in-possession prosecution but a sentencing enhancement for possession of a dangerous weapon in connection with a drug offense. *Greeno*, 679 F.3d at 517. In a "somewhat conclusory and unclear" fashion, the defendant argued that the enhancement violated his Second Amendment rights. *Id.*

at 516.  And on plain-error review, *Greeno* concluded that "possess[ing] a dangerous weapon for an unlawful purpose . . . falls outside the scope of the Second Amendment."  *Id.* at 520–21.  The court tethered its gun-possession analysis to the defendant's interrelated drug offense.  *Id.*  *Greeno* does *not* hold that felon-dispossession laws comport with the Second Amendment.  Here, although the United States charges each Defendant with gun possession in violation of federal law, the record gives no indication that such possession furthered an unlawful purpose, such as commission of another crime.

The United States is correct that *Bruen* abrogated only the second half of *Heller*'s two-part framework, leaving in place the first inquiry:  whether the Second Amendment covers the regulated conduct.  *See Greeno*, 679 F.3d at 518.  Circuit precedent holds that felon dispossession *does* burden Second Amendment conduct. The leading case is the *en banc* decision in *Tyler*, 837 F.3d at 690, which at step one explained that "people who have been involuntarily committed are not categorically unprotected by the Second Amendment."  Only at step two, in applying means-end scrutiny, did the court factor in *Heller*'s *dictum* regarding the presumptive lawfulness of disarming both "felons and the mentally ill."  *Id.* at 689–90.  *Heller*'s "presumption that such bans were lawful" was "precautionary, not conclusive"; "it did not invite courts onto an analytical off-ramp to avoid constitutional analysis."  *Id.* at 686–87. "After all, a measure can be presumptively constitutional and still have constitutionally problematic applications."  *United States v. Jackson*, 85 F.4th 468, 477 (8th Cir. 2023) (Stras, J., dissenting from denial of rehearing *en banc*).

Put another way, *Heller*'s *dictum* about the presumptive validity of disarming felons yields to *Bruen*'s holding that "the Constitution presumptively protects" gun possession and to the burden *Bruen* places on the United States to show an "historical tradition of firearm regulation" to overcome that presumption. *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 24. In several cases in the wake of *Bruen*, the Supreme Court granted certiorari, summarily vacated the judgment, and remanded to the court of appeals with instructions to apply *Bruen*. *See Association of N.J. Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894, 2894 (2022); *Duncan v. Bonta*, 142 S. Ct. 2895, 2895 (2022); *Young v. Hawaii*, 142 S. Ct. 2895, 2895–96 (2022); *Bianchi v. Frosh*, 142 S. Ct. 2898, 2898–99 (2022); *Morin v. Lyver*, 143 S. Ct. 69, 69 (2022); *see generally* Order List: 597 U.S. (June 30, 2022). The common denominator of these cases was not a may-issue licensing regime, like the one challenged in *Bruen*, but a lower court decision that applied constitutionally suspect two-step, means-end scrutiny to various firearm regulations. *See, e.g.*, *Young v. Hawaii*, 992 F.3d 765, 775, 783 (9th Cir. 2021) (en banc) (may-issue licensing); *Duncan v. Bonta*, 19 F.4th 1087, 1101, 1100 (9th Cir. 2021) (en banc) (large-capacity magazine ban); *Bianchi v. Frosh*, 858 F. App'x 645, 646 (4th Cir. 2021) (per curiam) (assault weapons ban) (citing *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc)). These orders confirm that, after *Bruen*, to withstand constitutional review gun regulations must survive historical analysis of a type the Sixth Circuit has not yet conducted on felon dispossession.

Consistent with this view, the Sixth Circuit recently recognized that its pre-*Bruen* precedents do not decide the constitutionality of Section 922(g)(1). *See United*

*States v. Bowers*, No. 22-6095, 2024 WL 366247, at *3 (6th Cir. Jan. 31, 2024) ("No binding case law addresses the constitutionality of § 922(g)(1) in light of *Bruen* . . . . Neither the Supreme Court nor the Sixth Circuit has yet to address the issue.").

### B.2.c. Plain Error

In several recent cases, the Sixth Circuit rejected Second Amendment challenges to Section 922(g)(1) on plain-error review.  *See, e.g.*, *Bowers*, 2024 WL 366247, at *2–3; *United States v. Heard-White*, No. 23-1146, 2024 WL 1049478, at *5 (6th Cir. Mar. 11, 2024); *United States v. Johnson*, No. 22-6048, 2024 WL 938081, at *6–7 (6th Cir. Mar. 5, 2024); *United States v. Goolsby*, No. 21-3087, 2022 WL 670137, at *3 (6th Cir. Mar. 7, 2022).  These decisions rest on "the government's 'compelling interest in . . . 'keeping firearms out of the hands of presumptively risky people.'" *Goolsby*, 2022 WL 670137, at *2 (quoting *Tyler*, 837 F.3d at 693–94).  After *Bruen*, the interest balancing of a compelling interest does not substitute for analyzing the text, history, and tradition of gun ownership and regulation.  In any event, as the United States acknowledges, a case decided on plain-error review does not result in binding precedent on this issue.

As a final aside, throughout their briefs and supplemental authorities, the parties reference numerous cases from other Circuits and various district courts. Some the Court discusses in this ruling.  Others it does not.  However, the Court notes that it has reviewed and considered these cases, even if not expressly mentioned, in the absence of controlling authority from the Sixth Circuit or the Supreme Court, which must ultimately resolve the important and unsettled constitutional questions these cases present.

## ANALYSIS

Under federal law, it is unlawful for any person "who has been convicted in any court of" a felony, "to possess in or affecting commerce[] any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(1).  Put simply, under federal law, "a person who is convicted of a felony is prohibited from possessing firearms." *United States v. Bean*, 537 U.S. 71, 74 (2002).

Defendants challenge the constitutionality of this statute, arguing that their separate prosecutions for possessing a gun as a felon are inconsistent with the fundamental right that the Second Amendment secures.  To determine whether the United States may enforce Section 922(g)(1) against any of these particular Defendants consistent with the Second Amendment, the Court proceeds first by examining the text of the Second Amendment, the history and tradition of felon disarmament, and the development of *federal* gun regulation, culminating in enactment of Section 922(g).  Then, the Court applies this history as presented by the parties to these cases.

## I.    Text, History, and Structure

"When the Constitution is not neutral about the issue, skeptical judicial review applies to the law from the start."  *L.W. v. Skrmetti*, 83 F.4th 460, 472 (6th Cir. 2023). When it comes to firearm possession, the Constitution is not neutral.  It specifically provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend II.  Significantly, this constitutional amendment does not create the right to

keep and bear arms.  Instead, it secures and protects a preexisting right that the People retain against the national government.  *Heller*, 554 U.S. at 592–94.

### I.A.    Language of the Second Amendment

Plainly, the Second Amendment's text covers the conduct of each Defendant. The United States charged each with "knowingly possess[ing]" a pistol and ammunition. (*Berry* ECF No. 1, PageID #1; *Tolbert* ECF No. 1, PageID #1; *Gardner* ECF No. 10, PageID #35.)   This alleged conduct lies at the heart of Second Amendment protection—keeping and bearing arms.  *Bruen*, 597 U.S. at 31–33; *Heller*, 554 U.S. at 592.  Without question, the weapons at issue in each case are "arms" that the text of the Second Amendment covers.  "[T]he American people have considered the handgun to be the quintessential self-defense weapon."  *Heller*, 554 U.S. at 629.  Pistols were "in common use at the time" of ratification.  *Id*. at 624; *Bruen*, 597 U.S. at 32.  Therefore, the people have a right to keep and bear such firearms.

And *Heller* makes clear that the term "the people" "unambiguously refers to all members of the political community."  554 U.S. at 580.  The "holder of the right" is "all Americans."  *Id*. at 581.  As Americans, Mr. Berry, Mr. Tolbert, and Mr. Gardner are "presumptively protect[ed]."  *Bruen*, 597 U.S. at 17.  Notwithstanding a felony conviction, one remains part of the political community, one of "the people" who enjoy the protections of the Constitution.  *See Range v. Garland*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc) ("[W]e reject the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment."); *cf. United States v. Vaello Madero*, 596 U.S. 159, 176 (2022) (Thomas,

28

J., concurring).  To say otherwise leaves "the safety of all Americans . . . to the mercy of state authorities who may be more concerned about disarming the people than about keeping them safe." *Caetano v. Massachusetts*, 577 U.S. 411, 422 (2016) (Alito, J., concurring).  Because the Second Amendment covers Defendants' alleged conduct, possessing a firearm, the United States bears the burden to "justify its regulation." *Bruen*, 597 U.S. at 18.

### I.B.   Historical Tradition

"Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct" is criminally punishable.  *Id*. at 17.  The regulation at hand *permanently* disarms all felons. 18 U.S.C. § 922(g)(1).  The United States "must affirmatively prove that [Section 922(g)] is part of the historical tradition" of firearm regulation.  *Bruen*, 596 U.S. at 19.

Contrary to the views of some courts and commentators, this central inquiry does *not* put judges in the position of "play[ing] historian in the name of constitutional adjudication."  *United States v. Bullock*, No. 3:18-cr-165, 2022 WL 16649175, at *1 (S.D. Miss. Oct. 27, 2022).  But *Bruen* does not assign judges (or lawyers) the historian's role of researching or analyzing primary source material.  "The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies."  *Bruen*, 597 U.S. at 25 n.6.  This legal inquiry depends on "various evidentiary principles and default rules" to resolve disputes in cases and controversies.  *Id*.  Further, in our legal system, courts are not independent investigators and depend on the principle and practice of party presentment.  Accordingly, the responsibility for presenting the

historical record and making legal and constitutional arguments based on it falls in the first instance to the parties, particularly the party which bears the burden—in this case, the United States.  The record in these cases demonstrates that all counsel involved in briefing and arguing the issue are up to the task and capably represented their respective clients.

### I.B.1. Historical Material

The United States presents historical evidence in chronological progression from "before, at, and after the Founding."  (*Berry* ECF No. 25, PageID #95–103.) Consistent with this framework, the Court proceeds in the same fashion.

### I.B.1.a. Pre-Founding

Enacted in 1328, at the outset of Edward III's 50-year reign as King, the Statute of Northampton prohibited Englishmen "to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour."  2 Edw. 3, c. 3 (1328).  The measure was likely designed to prevent "breach [of] the peace."  *Bruen*, 597 U.S. at 41.  The Statute predated handguns and is not believed to have "applied to the smaller medieval weapons," like daggers.  *Id*. at 42.  *Bruen* read the Statute as "ha[ving] little bearing on the Second Amendment."  *Id*. at 41.  It certainly did not, as the United States contends, mark the beginning of a 450-year tradition (up to the Second Amendment's ratification) of the government disarming persons it deemed unfit to carry arms.

A century before the Constitutional Convention, the English Bill of Rights of 1688 provided that "Protestants may have Arms for their Defence suitable to their

Conditions and as allowed by Law." 1 W. & M. Sess. 2, c. 2 (1688). That provision plainly allowed Parliament to infringe the right to bear arms. The English Bill of Rights did not displace England's Militia Act of 1662, which called on law enforcement to "seize all arms in the custody or possession of any person" deemed "dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662) (available at Duke Ctr. for Firearms Law). In addition, the Crown categorically disarmed Roman Catholics, except potentially "for the defence of his House or person." 1 W. & M. ch. 15 (1689) (available at Duke Ctr. for Firearms Law).

In this era, the United States establishes that England disarmed subjects it did not trust to possess weapons. It does not follow, however, that the Second Amendment permits regulation of arms that sweeps similarly broadly. Indeed, the Bill of Rights limits governmental abuses of power that the colonists suffered. In this respect, *Heller* recounts Thomas Cooley's view that the Second Amendment was a "modification and enlargement from the English Bill of Rights of 1688, where it stood as a protest against arbitrary action" of "disarming the people." *Heller*, 554 U.S. at 617. That is, the Second Amendment *expanded* on the protections for bearing arms in the 1688 Bill of Rights.

The United States locates justice-of-the-peace manuals from the 18th Century that counseled officials to disarm subjects "judged dangerous." (*Berry* ECF No. 25, PageID #96 & n.8 (citing Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737);

Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756)).) The United States highlights the governmental response to rioting that took place in London in 1780— confiscation of the rioters' arms. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-31 (1994). In those episodes, the authorities distinguished the "disorderly" from the "sober," the "peaceable Subjects" from those who posed a threat. *See, e.g.*, 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id.* at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]"). At this same time, Sir William Blackstone counted "having arms for their defense," subject to "due restrictions," as essential to one's "natural right of resistance and self-preservation." 1 William Blackstone, *Commentaries on the Laws of England* 136, 139–40 (1765); *Heller*, 554 U.S. at 594.

### I.B.1.b. Founding Era

Revolutionary Americans held a strong conviction for gun rights. The people of Massachusetts thought it "an essential privilege to keep Arms in Our houses for Our Own Defence" that "honest and Lawfull Subjects of Government . . . Ought Never to be deprived of." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, 624 (Oscar Handlin & Mary Handlin eds., 1966). In *Bruen*, the Supreme Court documents the Massachusetts law against possessing "arm[s] offensively, to the fear or terror of the good citizens of this Commonwealth." *Bruen*, 597 U.S. at 49–50 (quoting 1795 Mass. Acts and Laws ch. 2, at 436). Also, the

United States quotes the remarks of Nicholas Collin, who in 1788 espoused disarming those who posed a "real danger of public injury." *Remarks on the Amendments to the Federal Constitution . . . by a Foreign Spectator*, No. 11 (Nov. 28, 1788), *in Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights* 40 (Stanton D. Krauss ed., 2019).

At the Massachusetts ratifying convention, Samuel Adams, whose support of the Constitution's ratification was contingent on adding a Bill of Rights, argued that the "Constitution be never construed to authorize Congress to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) (citation and alterations omitted). Anti-Federalists at the Pennsylvania ratifying convention advanced a similar proposal. The Pennsylvania proposal stated: "no law shall be passed for disarming the people, or any of them, unless for crimes committed, or real danger of public injury from individuals." 2 *The Documentary History of the Ratification of the Constitution* (*Documentary History*) 598 (Merrill Jensen ed., 1976).

As then-Judge Barrett persuasively explained, however, these proposals captured the feelings of many but were not reflected in the ratified text of the Second Amendment itself. *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). Other States had alternative arms-bearing proposals and State constitutional provisions. *Id*. Judge Barrett rejected the argument that "peaceable citizens"—Samuel Adams's term—was "a synonym for 'non-felons' or even 'non-criminals.'" *Id*. at 456. Instead, non-peaceable citizens—"[t]hose who 'breached the peace'"—presented "at least a

threat of violence." *Id.* at 455–56 (quoting Noah Webster, An American Dictionary of the English Language (1828), and *Atwater v. Lago Vista*, 532 U.S. 318, 327 n.2 (2001)). The Massachusetts and Pennsylvania proposals do show, however, that the "concern that animated English and early American restrictions on arms possession" related to "threatened violence and the risk of public injury." *Id.* at 456.

### I.B.1.c. Post-Ratification

"Interpretations of the [Second] Amendment in the period immediately following its ratification help to establish the public understanding of the text at the time of its adoption." *McDonald*, 561 U.S. at 835 (Thomas, J., concurring in part and concurring in the judgment); *Bruen*, 597 U.S. at 35–36 (quoting James Madison). The United States opens with scholar John Holmes, who in 1840 stated, a "free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840). Rhode Islanders and the mayor of Washington similarly distinguished the arms-bearing rights of "peaceable citizens" from "the lawless." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1; Joseph Gales, *Prevention of Crime, in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

In the Bleeding Kansas disputes that preceded the Civil War, political leaders advocated "disarm[ing] any armed band[its]" causing upheaval. Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856) (Henry Wilson). Prominent abolitionists objected to the disarming of "peaceable citizens." A.J. Grover, *Impeachment of Franklin Pierce* (Aug. 1, 1856), *in* The Liberator, Aug. 22, 1856, at 140.

From the period after the Civil War, the United States quotes a Reconstruction era publication of the Freedman's Bureau that "[a]ny person, white or black, may be disarmed if convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866). The Bureau sent the same message in South Carolina: "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908–09.

But the United States does not rely on the text of the Thirteenth Amendment, which abolished slavery—and its coerced disarmament—"except as a punishment for crime whereof the party shall have been duly convicted." U.S. Const. amend. XIII. Nor does it address the history of Robert E. Lee's surrender at Appomattox Courthouse, where rebels who took up arms against the United States surrendered. Federal troops under the command of Ulysses S. Grant paroled the Confederate officers, allowing them to return to their homes with their side arms. Ulysses S. Grant, *Personal Memoirs of Ulysses S. Grant* 630–31 (Konecky & Konecky 1992).

### I.B.2. Class-Based Gun Regulations and Surety Laws

The United States also recounts the history of certain class-based gun regulations. For example, during the Revolution, several States enacted laws to disarm loyalists. *See, e.g.*, 4 *Journals of the Continental Congress* 1774–1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2,

35

5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large:  Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).  This wartime legislation targeted a class of persons who posed a threat to the young Nation as it fought for its independence and survival.

After Shays' Rebellion in 1787, Massachusetts required the rebels, as a condition of their pardons, to surrender their arms.  After three years, however, the arms were to be returned to the rebels.  Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805).

By the late 19th Century, States disarmed groups including minors,[1]

---

[1] *See, e.g.*, Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26,

vagrants,[2] and intoxicated persons.[3]  Each of these classifications relates to a condition that is not permanent.

Adititionally, the United States documents the use of State surety laws throughout the 19th Century.  Such laws required the forfeiture of weapons from certain persons unless they posted a bond, but they did not effect a permanent disarmament.  *Bruen*, 597 U.S. at 56.  For example, under the Massachusetts surety law, "reasonable cause to fear an injury, or breach of the peace" justified forfeiture and a bond requirement for rehabilitation but not permanent dispossession.  *Id.* (quoting Mass. Rev. Stat., ch. 134, §16 (1836)).  "Under surety laws, . . . everyone started out with robust carrying rights"; only a reasonable accusation that a person posed a threat justified burdening those rights.  *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017).

---

1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[2] *See, e.g.*, Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[3] *See, e.g.*, Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

### I.B.3. Felony Punishment

Beyond gun regulations, the United States recites the historical tradition of punishing felons.  In short, at the Founding, capital punishment was a common punishment for felony offenses.  *Folajtar v. Attorney Gen'l of the U.S.*, 980 F.3d 897, 904–05 (3d Cir. 2020), *abrogated in part by Bruen*, 597 U.S. 1.  Short of the death penalty, American law recognized the concept of "civil death"—"a state in which . . . all civil rights were extinguished."  *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting).  But civil-death status was most often associated with life sentences.  *Id.* at 459–61.  "Felons serving a term of years" had "their rights . . . suspended but not destroyed."  *Id.* at 461.  That suspension generally lasted only during the term of incarceration.  *Id.* (citations omitted).  A less severe punishment for a felony offense was forfeiture of estate.  *Id.* at 458–59 (citations omitted).

According to the United States, the greater authority to deprive felons' life, liberty, or property includes the lesser authority to confiscate their guns.  "This is simply not the way that reasoned constitutional adjudication proceeds."  *United States v. Morrison*, 529 U.S. 598, 624 (2000).  No principle limits this argument to the right to bear arms.  Such a principle would permit permanent and total deprivation of any and all civil liberties—assembly, speech, religious exercise, unreasonable searches, the right to counsel, and so on.  But "we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding."  *Kanter*, 919 F.3d at 461–62 (Barret, J., dissenting).  To be sure, fundamental civil rights apply differently or in a more limited fashion to those incarcerated or on supervision.  *See, e.g.*, *Turner v. Safley*, 482 U.S. 78, 89 (1987)

(free exercise rights of inmates); *United States v. Knights*, 534 U.S. 112, 121 (2001) (Fourth Amendment rights of probationers).

In this line of argument, the United States appeals to the historical tradition of penalizing crime rather than regulating gun possession.  As with all other guarantees of the Bill of Rights, the Court must apply the relevant body of precedent. Under current law, punishments must comport with society's "evolving standards" to survive judicial review.  *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (citation omitted).  But Defendants do not contend that disarming felons is a "cruel" or "unusual punishment[]."  U.S. Const. amend VIII.  Ultimately, *Bruen* provides the analytical framework where a regulation burdens the right to bear arms.  *Bruen*, 597 U.S.at 24.  The historical tradition of capital punishment does not permit the Court "to sidestep *Bruen* in the way the government invites."  *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).

### I.C.    Federal Firearms Regulation

"For most of our history . . . the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens."  *Heller*, 554 U.S. at 625. To the contrary, postbellum legislation, such as the Freedman's Bureau Act of 1866, enacted over President Johnson's veto, *secured* rather than regulated "the constitutional right to bear arms" of "all the citizens."  Act of July 16, 1866, Ch. 200, § 14, 14 Stat. 173, 176.  In this way, Congress sought to end the disarmament of freed slaves in the South and extend to them the privileges and immunities of citizenship, *including* the right to keep and bear arms.  *McDonald*, 561 U.S. at 774 n.23.

Federal restrictions on the possession of firearms have gradually increased in scope and scale. In 1927, Congress prohibited use of the postal service to mail "pistols, revolvers, and other firearms capable of being concealed on the person." Act of Feb. 8, 1927, Ch. 75, § 1, 44 Stat. 1059, 1059–60. In 1934, exercising the taxing power, Congress enacted "the first major federal firearms law," *Heller*, 554 U.S. at 637 (Stevens, J., dissenting), the National Firearms Act, Pub. L. No. 73–474, Ch. 757, 48 Stat. 1236. The National Firearms Act required sellers and owners to register their guns, taxed transactions, required serial numbers, and provided for "seizure and forfeiture" of unlawfully transferred firearms. *Id*. at 1237–39. However, the Act did not regulate pistols or revolvers. *Id*. at 1236, § 1(a) (defining "firearm"). At least one federal court held that the Act's registration and stamp-affixed-order requirements violated the Second Amendment. *United States v. Miller*, 26 F. Supp. 1002, 1003 (W.D. Ark. Jan. 3, 1939). But the Supreme Court reversed, reconciling the 1934 Act with the Second Amendment as well as the "police power reserved to the States." *Miller*, 307 U.S. at (1939).

As relevant to this case, the Federal Firearms Act of 1938 represented the first federal felon dispossession legislation. Congress described it as an act "[t]o regulate commerce in firearms." Pub. L. No. 75–785, Ch. 850, 52 Stat. 1250. Broader than the 1934 Act, the 1938 Act covered "any weapon . . . designed to expel a projectile . . . by the action of an explosive." *Id*., § 1(3). The 1938 Act prohibited anyone "convicted of a crime *of violence*" from "receiv[ing] any firearm or ammunition" through channels of interstate commerce and treated "possession" as "presumptive evidence" of a

40

violation.  *Id.* at 1251, § 2(f) (emphasis added).  It defined a "crime of violence" to correspond to specific enumerated offenses:  "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking," and various forms of aggravated assault.  *Id.* at 1250, § 1(6).

In 1961, Congress expanded the felon-in-possession prohibition to cover (subject to exceptions) crimes punishable by more than a year in prison.  *See* An Act To Strengthen The Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961).  Later that decade, Congress repealed the Federal Firearms Act and enacted sweeping criminal legislation in its place.  *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title IV, § 906, Ch. 44, 82 Stat. 197, 234 (1968).

Then, the same Congress revised the legislation by enacting the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968), "the most comprehensive gun control law ever signed in this Nation's history."  President Lyndon B. Johnson, Remarks Upon Signing the Gun Control Act of 1968, 2 Pub. Papers 1059, 1059 (Oct. 22, 1968).  The Gun Control Act sought to prevent "crime and violence" without "intend[ing] to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes."  Gun Control Act of 1968 at 1213–14, § 101.  But the Act considerably expanded the scope of federal gun regulation.  *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).

Section 922(g)(1) is a direct descendent of a provision in the 1968 Gun Control Act making it "unlawful for any person . . . who . . . has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . to receive

any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 82 Stat. at 1220–21, § 922(h)(1). Rather than enumerate crimes of violence as predicate offenses to disarmament like the Federal Firearms Act before it, the Gun Control Act covered all crimes punishable by more than one year in prison, excluding only a shortlist of "offenses relating to the regulation of business practices" and most State misdemeanors. *Id.* at 1216, § 921(a)(20).

Significantly, the 1968 law afforded felons a pathway to restoration of the right to bear arms by applying "for relief from the disabilities imposed" against "possession of firearms." *Id.* at 1225, § 925(c). Under the statute, a federal official (originally, the Secretary of the Treasury) had authority to grant relief if satisfied that "the applicant [would] not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Id.*

Formally, that avenue for administrative relief from the lifetime disability federal law places on felons remains on the books today: a felon "may make application to the Attorney General for relief from the disabilities," with a right to challenge any denial in federal court. 18 U.S.C. § 925(c); 27 C.F.R. § 478.144. Since 1992, however, Congress has foreclosed the possibility for such restoration of rights through Section 925. In its appropriations to the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Congress "prohibited the expending of any funds to investigate or act upon applications for relief from federal firearms disabilities." ATF, *Is there a way for a prohibited person to restore their right to receive or possess firearms and ammunition?*, available at https://www.atf.gov/firearms/qa/there-way-

42

prohibited-person-restore-their-right-receive-or-possess-firearms-and); *see also* William Baude & Robert Leider, *The General Law Right to Bear Arms*, 99 N.D. L. Rev. at 32 (forthcoming 2024) (manuscript); Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1729, 1732 (1992). By defunding the administrative mechanism for restoring the right to bear arms, Congress also foreclosed access to judicial review. *Bean*, 537 U.S. at 76.

As amended, Section 922 prohibits a broad range of conduct involving firearms. 18 U.S.C. §§ 922 & 924. Section 922(g) categorically prohibits the following persons from possessing a firearm: (1) felons, (2) fugitives from justice, (3) controlled substance addicts or unlawful users, (4) anyone "who has been committed to a mental institution" or is "mental[ly] defective," (5) illegal immigrants, (6) anyone dishonorably discharged from the Armed Forces, (7) anyone who "has renounced his citizenship," (8) anyone subject to a domestic violence restraining order, and (9) those convicted of misdemeanor domestic violence. These restrictions on gun possession do not expire after a particular period of time for any of the listed categories—they impose an "inflexible, lifetime ban" on exercising a fundamental constitutional right. *Tyler*, 837 F.3d at 695.

With its origins in the New Deal era, the congressional project of limiting the right to keep and bear arms "falls well short of 'longstanding' for purposes of" establishing a tradition of restricting the right to bear arms, *Range*, 69 F.4th at 104, particularly when compared to the longer history dating back to 1866 and 1791 securing and extending that right. Also, it shows that, when acting expansively to

disarm permanently all felons in 1968, Congress reconciled this categorical restriction of a fundamental constitutional right with an individualized opportunity for restoration of the right to keep and bear arms consistent with the nation's history and tradition of firearm possession.

## II.    Defendants' Right to Bear Arms

Where, as here, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.  In contrast, "'modern regulations that were unimaginable at the founding' need only be 'relevantly similar' to" historical analogues. *Range* 69 F.4th at 103 (quoting *Bruen*, 597 U.S. at 28).  Felon-disarmament statutes did not appear until the 20th Century. Because "the Founders themselves could have adopted" such laws but did not, *Bruen* at 27, the history and tradition of firearm regulations demonstrate that judicial deference to this legislative enactment is not appropriate in the face of the right to keep and bear arms that the Second Amendment secures, *id.* at 26.

But that history and tradition does not end the matter, as Defendants contend. Instead, for the regulation to survive constitutional muster, the historical record must "evince[] a comparable tradition of regulation." *Bruen*, 597 U.S. at 27.  This analysis invites comparison of "how and why the regulations burden" the right to bear arms.  *Id.* at 29.  And the United States must show that a modern regulation is "distinctly similar" to its comparators.  *Id.* at 26.  To that inquiry, the Court now turns as it applies to these particular Defendants and their backgrounds.

### II.A.   Comparable Regulations

After "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815," one historian found that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic."  Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 142, 143 & n.11 (2007).  Instead, the historical record the parties present shows the "undeniable throughline" that "Founding-era governments took guns away from persons perceived to be dangerous."  *United States v. Daniels*, 77 F.4th 337, 352 (5th Cir. 2023).  The "how and why" of such restrictions, *Bruen*, 597 U.S. at 29, were the same historically as today.  Legislatures sought to mitigate armed violence by "disarming those perceived as dangerous."  Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms¸* 20 Wyo. L. Rev. 249, 262 (2020).

Historically, laws addressed dangerousness by identifying and restricting certain acts (such as "go[ing], offensively armed, in Terror of the People") or conditions (such as "dangerous and disaffected" persons), at least temporarily.  *Id.* at 259, 262.  The United States posits that this line runs through *Heller* and allows legislatures to disarm individuals who are not "law-abiding, responsible citizens."  In a colloquy with the Chief Justice at oral argument in *Rahimi*, the Solicitor General argued that law-abiding means a non-felon, *United States v. Rahimi*, No. 22-915, Transcript of Oral Argument at 8 (U.S. argued Nov. 7, 2023), and responsible means

objectively not dangerous, *id.* at 10–11.  So understood, "law-abiding" and "responsible" represent discrete categories.  "Law-abiding" is a status-based distinction (felon or non-felon).  "Responsible" distinguishes based on condition (dangerous or safe to possess a weapon).  If an individual is not *both*, the United States argues, he may be disarmed.

In making this argument, the United States reads *Heller* and *Bruen* as limiting the analysis to law-abiding and responsible citizens.  As noted above, *Heller* and *Bruen* both involved law-abiding litigants.  But *Bruen* without reservation requires an historical analogue anytime "the Second Amendment's plain text covers an individual's conduct."  *Bruen*, 597 U.S. at 17.  The Supreme Court did not limit this analysis only to the law abiding.

Courts disagree over the historical tradition of disarming persons based on felony status.  *Compare United States v. Jackson*, 69 F.4th 495, 504–05 (8th Cir. 2023) (permissible), *with Range*, 69 F.4th at 106 (impermissible), *and Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (same).  The Sixth Circuit has not yet spoken to the issue but recognizes that its pre-*Bruen* precedents do not resolve the matter.  *See Bowers*, 2024 WL 366247, at *3.  Far more accepted is the historical tradition of disarming the dangerous—those whose gun possession threatens others—at least on a temporary basis.  *See* Greenlee, *The Historical Justification for Prohibiting Dangerous Perrons from Possessing Arms¸* 20 Wyo. L. Rev. at 261 (chronicling the history).  "The most cogent principle that can be drawn from traditional limitations on the right to keep and bear arms is that dangerous persons likely to use firearms

46

for illicit purposes were not understood to be protected by the Second Amendment." *Binderup v. Attorney Gen. United States of America*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments).

But Section 922(g)(1) relies on prior felony convictions—an imperfect fit for the traditional approach to disarmament. Felony status as a proxy for dangerousness is both under- and over-inclusive, *Kanter*, 919 F.3d at 454 (Barrett, J., dissent), particularly as the reach of federal and State criminal law has expanded. Under *Bruen*, the question becomes whether Section 922(g)(1) presents a "distinctly similar" restriction as the history of disarming dangerous individuals that justifies the statute's burden on the right of armed self-defense.

### II.A.1. Felonies as "Distinctly Similar" to Dangerousness

Congress enacted the Gun Control Act to support the "fight against crime and violence." Pub. L. No. 90-618, 82 Stat. at 1213. President Johnson echoed that sentiment from the White House when signing the legislation into law: "Today we begin to disarm the criminal and the careless and the insane." Johnson, 2 Pub. Papers at 1059. The Act serves that purpose by "keep[ing] firearms out of the hands of" people with a propensity to commit crime (felons and fugitives from justice, for example) or endanger others (such domestic abusers, the mentally ill, drug addicts, and minors). *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983); *see* 18 U.S.C. §§ 922(g) & (x)(2). Focusing on felon dispossession, the law serves an anti-recidivist purpose: it prevents individuals with a criminal disposition from carrying a weapon that could facilitate further criminal activity. "These interests," for what it is worth, "are compelling." *Tyler*, 837 F.3d at 693.

47

Mr. Berry has a prior felony conviction for robbery in violation of Section 2911.01(A) of the Ohio Revised Code when he was 19 years old, less than four years ago.  Mr. Tolbert has prior felony convictions for robbery under Section 2911.02(A)(3) when he was 19 years old and for trespass in a habitation when he was 20, both within the last six years.  Mr. Gardner has several felony convictions, including for receiving stolen property when he was 18, voluntary manslaughter a couple years later, trafficking in cocaine at age 24, and at age 27 aggravated robbery in violation of Section 2911.01(A)(1).  In the years since Mr. Gardner's robbery conviction, he has also been convicted of felony cocaine possession.  Though having different criminal histories, these Defendants share prior felony convictions for the offense of robbery.

The crime of robbery has plagued societies from time immemorial.  Blackstone defined robbery as "[o]pen and violent larceny from the person . . . ."  4 Blackstone, *Commentaries* at 241.  Blackstone considered robbery an aggravated theft offense, marked by "the felonious and forcible taking, from the person of another, of goods or money to any value, by violence or putting him in fear."  *Id.*; *see Carter v. United States*, 530 U.S. 255, 278 (2000) (Ginsburg, J., dissenting).  Leading up to the Founding, robbery was "so heinous a crime" as to be treated as a capital offense. 4 Blackstone, *Commentaries* at 242–43.  Blackstone's exposition establishes that robbers endangered the community.  Indeed, creating "an apprehension of violence" would satisfy robbery's "fear" element.  *Id.* at 242.  The Ohio General Assembly "incorporated [Blackstone's definition] almost literally into the statute."  *Turner v. State*, 1 Ohio St. 422, 425 (1853).

## II.A.2. As Applied to These Defendants

Given its historical pedigree, Ohio's felony robbery offense is "distinctly similar" to the historical predicates on which the United States relies that support disarmament based on dangerousness.  The "modern and historical regulations impose a comparable burden on the right of armed self-defense and . . . that burden is comparably justified." *Bruen*, 597 U.S. at 30.  Although disarming a robber today "is not a dead ringer for historical precursors," it is "analogous enough to pass constitutional muster." *Id.*  Therefore, without running afoul of the Second Amendment, Congress may disarm those with prior felony convictions for robbery, at least in the cases of these three Defendants.

Moreover, the record in these cases confirms the application of the disability to each Defendant beyond their various robbery convictions.  Mr. Berry's record shows escalation in the seriousness of his criminal activity, from misdemeanor petty theft to violation of his intervention in lieu of conviction program and failure to the failure of his reentry program in 2022.  Additionally, very little time has passed since Mr. Berry's conviction.  Following Mr. Tolbert's robbery conviction, he pled down a second similar offense then later had misdemeanor convictions for domestic violence and assault.  And Mr. Gardner has an extensive criminal record already detailed, which includes a conviction for voluntary manslaughter.  Congress enacted Section 922(g)(1) to combat the dangers that persons with histories of such criminal conduct pose to their communities.  Disarmament of these individuals does not burden the right to keep and bear arms without a comparable, historical precursor—providing a constitutional justification for application of the statute to these Defendants.

## II.B.  Permanence

Where the history and tradition of gun regulation place the United States on shakier footing is in the *permanence* of the disability Section 922(g)(1) enforces. Other than capital punishment, which the Court already addressed, the historical record generally shows that laws providing for disarmament of particular individuals were delimited in time or afforded them a means for restoration of the right to keep and bear arms.  For example, during the Revolution, even Tories could retain their arms after swearing an oath of loyalty to the emerging government.  *See Jackson*, 69 F.4th at 503.  And those who participated in Shay's Rebellion had their rights to firearms restored after three years.  In short, "none of the historical regulations offered by the government permanently disarm a group of people."  *United States v. Williams*, No. 23-cr-20201, 2024 WL 731932, at *20 (E.D. Mich. Feb. 22, 2024); *see also United States v. Prince*, No. 22 CR 240, 2023 WL 7220127, at *8 (N.D. Ill. Nov. 2, 2023).

Moreover, the opportunity for an individual to regain the right to possess firearms persists throughout American history.  Indeed, in the Gun Control Act of 1968, the same Congress that enacted the most sweeping gun regulations the nation has seen recognized that the history and traditions of firearm ownership required an individualized opportunity for restoration of Second Amendment rights.  In light of the historical record, enactment of Section 925 appears necessary to meet the constitutional minimum of protections for individual rights under the Second Amendment.

However, Congress has functionally repealed Section 925. Without an opportunity at the federal level for restoration of rights, the United States pointed at oral argument to the availability of remedies under Ohio law for a person to regain the right to possess a firearm. Namely, Ohio has a process for judicial restoration of rights by sealing or expunging certain convictions, *see* Ohio Rev. Code § 2923.14, and the Governor of Ohio has implemented an expedited pardon project that results in lifting the disability of a felony conviction for qualifying individuals. But the Court need not consider whether the congressional prohibition on implementation of Section 925 renders Section 922(g)(1) unconstitutional or whether Ohio's narrow avenues for restoration save the statute either. This is so because there is no evidence in the record that Mr. Berry, Mr. Tolbert, or Mr. Gardner would qualify for any such restoration. Put another way, the background of each Defendant before the Court places him among the group of dangerous persons whom the government may disarm, at least on a temporary basis, and nothing suggests for any Defendant that the appropriate temporary period of disarmament has reasonably passed.

In an appropriate case, however, the absence of distinctly similar historical regulations permanently disarming a person without the opportunity for restoration points out an inconsistency with the Second Amendment that might require relief. But these cases do not present such circumstances. Nor do they present an appropriate occasion to identify or consider the many difficult questions under the Second Amendment that lie ahead either generally or for any of these Defendants.

51

## CONCLUSION

For all these reasons, the Court determines that the United States may enforce Section 922(g)(1) against Mr. Berry, Mr. Tolbert, and Mr. Gardner consistent with the Second Amendment.  Therefore, the Court **DENIES** Defendants' motions to dismiss the indictments against them.

**SO ORDERED.**

Dated:  March 15, 2024

_____

J. Philip Calabrese
United States District Judge
Northern District of Ohio